**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Felix KERR, Defendant-Appellant.**

**No. 71-2084.**

United States Court of Appeals,
Sixth Circuit.

Aug. 7, 1972.

Carter Schoolfield, Schoolfield & Taylor, Chattanooga, Tenn., for defendant-appellant.

John L. Bowers, Jr., U. S. Atty., George H. Garrett, W. Thomas Dillard, Charles N. Stedman, Jerry Foster, Asst. U. S. Attys., for plaintiff-appellee.

Before EDWARDS and CELEBREZ-ZE, Circuit Judges, and THOMAS,* District Judge.

WILLIAM K. THOMAS, District Judge.

Tried and found guilty by a jury, defendant-appellant appeals his conviction of the crime of aiding and abetting the possession of unstamped whisky. He was indicted in the second count of a joint indictment. It charges that:

On or about the 23rd day of August, 1970, in the Southern Division of the Eastern District of Tennessee, Robert Winford Howard and Martin McKenzie, aided and abetted by James Felix Kerr, did possess a quantity of distilled spirits, required to be stamped under the provisions of Section 5205 (a) (2), Title 26, U.S.C. . . . .

As his only ground of appeal defendant-appellant assigns the trial court's failure to declare a mistrial or to grant a new trial "based on prejudicial statements of the United States Attorney in his cross-examination of the defendant's witnesses." To properly assess the claimed prejudicial cross-examination the evidence must be reviewed.

## I.

David Sellers, special investigator of the Alcohol, Tobacco, and Firearms Division of the United States Treasury Department, based in Dalton, Georgia and Ted Parsons, special (undercover) employee of the Department looked up Howard Brantlett on Sunday, August 16, 1970. Parsons and Brantlett knew each other in Dalton. Parsons had been in the illegal whisky business and had been convicted twice of selling illegal whisky. Brantlett admitted that he had been in the non-tax paid liquor business. He says he finally quit in 1965.

Sellers and Parsons located Brantlett at his novelty shop on U. S. Highway 411, five miles south of Benton in Polk County, Tennessee. Brantlett and his wife leased from defendant Kerr the shop, house, and surrounding picnic grounds. Polk County abuts the Tennessee-Georgia line. Dalton is in Whitfield County, Georgia which adjoins the state line about 20 miles south and west of Polk.

Sellers and Parsons each testified that Parsons told Brantlett they wanted to buy some moonshine whiskey. Brantlett responded that he wasn't messing with liquor any more. They then asked him if he knew where some could be gotten, and he answered, "Yes, sir." Sellers testified that Brantlett stated that "he knew somebody who could get us some. He knew just the man." He then left his place on his motorcycle; and Sellers and Parsons remained.

Later Brantlett returned. Later yet, defendant Kerr arrived. According to Sellers and Parsons defendant Kerr was driving a brown Falcon station wagon that had a Tennessee dealer's tag, license number 1954. A white Chevrolet driven by co-defendant Bob Howard (who pleaded guilty to the indictment) and a green GTO Pontiac, driven by co-defendant Martin McKenzie (who also pleaded guilty) delivered the whiskey to Sellers and Parsons the following Sunday, August 23, 1970. Howard's car and McKenzie's car displayed dealer license tags identical with the tag on defendant Kerr's brown Falcon. It is undisputed that these dealer license tags were issued to Bob Howard's used car business.

Sellers and Parsons each testified that they told defendant Kerr that they wanted to get some moonshine whiskey. As stated by Sellers and substantially confirmed by Parsons, defendant Kerr answered:

[H]e said he had some friends who had about eleven hundred gallons on hand, and that he could get us all we wanted for about six dollars a gallon.

Sellers said that Kerr did not indicate who his friends were. They told him they would like to have a hundred gallons. He said, "he would have the ar-

---

* Honorable William K. Thomas, United States District Court for the Northern District of Ohio, sitting by designation.

rangements about a week for us to get the whiskey."

A week later, on August 23, 1970, Sellers and Parsons returned to Howard Brantlett's place. Sellers was carrying over $600 because he said he intended to pay $600 for the whisky. He says this was "because Mr. Kerr stated on the evening of the 16th it would be six dollars a gallon."

Continuing the account of Sellers, also generally testified to by Parsons, defendant Kerr appeared in his brown station wagon that still bore co-defendant Howard's dealer tag. Kerr said that "the arrangements were made." He went around to the front of the store, walking back a few minutes later. Pointing to a white Chevrolet that was leaving, Kerr said "there goes a man to get your whiskey." The car turned south on Highway 411. Defendant Kerr stayed with them.

About 8:00 p. m. the white Chevrolet returned and a green GTO Pontiac came in also. Sellers says that the defendant identified the man driving the Chevrolet as Bob Howard. Sellers said that he then recognized Martin McKenzie in the green GTO. They had bought whiskey from McKenzie previously. Sellers says that he told McKenzie that he was surprised to see him and they talked "a little bit about the quality of whiskey we had gotten from him before." He says he told him "we sure didn't want any more of that." He said that McKenzie assured him that "this was good whiskey."

Sellers quotes defendant Kerr as saying, after some discussion, "let's go to my house. It will be the safest place to exchange it." Four cars drove to Benton, five miles away. Sellers and Parsons each described what happened there. Howard pulled the white Chevrolet in first. McKenzie was next. Then Parsons and Sellers pulled in. Kerr's car was last.

At Kerr's house defendant Kerr did not touch the whiskey but he was directing the cars where to park, according to Parsons. Sellers testified that Kerr came in behind him, stopped, and told him to pull close to the dog-pen. Corroborated by Parsons, Sellers says Kerr pointed to his garage, a kind of basement under his house, and said, "you can unload the whiskey in here if you would like to." The hundred gallons of whiskey, apparently bottled in plastic jugs, was transferred from the trunks of Howard's white Chevrolet and McKenzie's green Pontiac to Sellers' car. He says that defendant Kerr was standing "alongside the rest of us." Sellers gave $600 to Bob Howard for the whisky. Sellers and Parsons then got into their car and left.

The testimony of Howard Brantlett, called as a witness by the defendant, verifies the August 16th meeting with Sellers and Parsons. He testified that Parsons told him they wanted to get some whiskey. He responded that he "didn't fool with it no more." He happened to remember "somewhere out there Bob Howard had some".

He told of driving to Benton on his motorcycle to talk with defendant "Jake" Kerr, as he calls him, his return, and Kerr's arrival at Brantlett's novelty shop. There he introduced Kerr to Sellers and Parsons. While not relating any conversation between Kerr and them, Brantlett says he told Sellers and Parsons "I didn't see Bob but I would try to get in touch with him because I always liked old Ted."

Brantlett further testified that later on that week he·

. . . come by to see him [Howard] . . . and I told him these two fellows from Dalton wanted to see him, and told him what they wanted. And I told him they were supposed to come back the following Sunday.

As to Sunday, August 23rd, he says that Bob Howard came to his place of business twice. He says that he told Parsons and Sellers "there's your man." He says Howard was gone a "couple or three hours". On Howard's return he, Brantlett, was told about a second car,

but never saw a second car. He says they wanted to change the liquor behind his building and he would not let them.

On cross-examination the assistant district attorney put the question to Brantlett, "Mr. Brantlett, isn't it true Bob Howard discussed with you the price of this whiskey?" He responded, "No, sir. I didn't hear no prices discussed." In contrast, Bob Howard, also called as a defense witness, testifies that he had told Brantlett that the whiskey was six dollars a gallon.

Howard testified that on Sunday before he delivered the whiskey he saw Mr. Kerr at the post office in Benton, and that "he told me that Mr. Brantlett wanted to see me." He answered, "Yes, sir" in response to defense counsel's question "All right, did you then later go to see Mr. Brantlett?" Thus, Howard contradicts Brantlett for the second time. As previously quoted, Brantlett testified "yes I come by to see him [Howard]."

Quizzed concerning Sunday, August 23, 1970, Howard testifies that he came twice to the Brantlett property. He says he talked to Mr. Brantlett who told him "that the people was there for it then." He was then asked, "all right, and then did you go get the liquor?" He answered, "Yes, sir, I did."

As to the events of Sunday, August 16th, Kerr testified that Brantlett came to Kerr's but he denies that Brantlett told him there were some men down at his store who wanted to buy some whiskey. He says he called Bob Howard at Brantlett's request. He did not get any answer and he drove to Brantlett's place. As to his conversation with Sellers and Parsons, Kerr testified:

All right, and Mr. Brantlett introduced you to Mr. Parsons and Sellers, stating you were the man who could get the whiskey, didn't he?

I deny that. When I first drove up, he said, "Jake, did you find Bob?"

I said, "No, he didn't answer his phone." He said, "These men here want some whiskey. They need to get in touch with Bob about some whiskey.

I said, "Bob Howard don't sell whiskey."

He repeated this statement at several points in his testimony, but he denied the statements attributed to him by Sellers and Parsons. He further said:

. . . they didn't discuss any prices. Howard Brantlett then introduced—I never introduced it to them.

He admitted that he saw Bob Howard "and told him Howard Brantlett wanted to see him."

This completes all the testimony of Bob Howard, Howard Brantlett, and defendant Kerr that can explain how Sellers and Parsons learned that the price of the whiskey was six dollars.

The defense of defendant Kerr was built upon the theory that Howard Brantlett, and not James Felix Kerr, took the whiskey order from Sellers and Parsons, and arranged with Bob Howard for him to get the whiskey and deliver it on August 23, 1970. With Brantlett denying that he discussed the price of whiskey with Bob Howard, defendant Kerr's defense was shaken. Kerr's two principal witnesses, Bob Howard and Howard Brantlett, diametrically contradict each other on this essential point and on other points. Brantlett also contradicted Kerr's own testimony that it was Howard Brantlett who introduced the price of the whiskey.

The jury knew it had to be either defendant Kerr or Howard Brantlett who informed Sellers and Parsons that the price of the whiskey was six dollars a gallon. It had to be either Kerr or Brantlett who transmitted the hundred-gallon order at six dollars a gallon to Bob Howard. The evidence reveals that only the admissions of defendant Kerr, as testified to by Sellers and Parsons, supply the essential link between Sellers and Parsons, the buyers, and Bob Howard and Martin McKenzie, the sellers of the whiskey. Thus, the only reliable evidence on this point warranted the jury in concluding, as it obviously did, that

it was Kerr who took the 100-gallon order of Sellers and Parsons, that he disclosed to them the six dollars a gallon price, and that it was Kerr who made the arrangements for the purchase and sale.

The testimony of Bob Howard and defendant Kerr leaves the impression that the use of Kerr's house as the point of whiskey transfer was without Kerr's approval. Instead, the jury's verdict shows that it believed Sellers and Parsons that Kerr was present at all times during the transfer, that he directed the parking of the cars, and that he offered his canvas covered garage for the transfer.

The trial court correctly and fully defined the crime of aiding and abetting and accurately and fully charged on all other elements and steps essential to a finding of guilt by evidence beyond a reasonable doubt. As shown by this review the evidence is sufficient to support the finding that the defendant was guilty of aiding and abetting his codefendants Bob Howard and Martin McKenzie in possessing illegal unstamped whisky on August 23, 1970.

## II.

In pressing his ground of error, defense counsel argues that "the United States Attorney exceeded the bounds of propriety in cross-examining the witness, Robert Howard, and the witness, Charles Ragan."

The testimony of Robert Howard has been reviewed and discussed as it bears on the defense of James Felix Kerr on whose behalf he was called as a witness. The Government commenced Howard's cross-examination by developing his plea of guilty to the alteration of serial numbers on 62 stolen automobiles. He was then in jail in Dalton, Georgia on the state charge and he previously pleaded guilty in federal court to conspiracy involving the same altered serial numbers. He admitted that Martin McKenzie was involved in the conspiracy case. Robert Howard also admitted that the criminal offenses involving the alteration of serial numbers on stolen cars dealt with Robert

Howard's used car business; and that he used dealer tags in his used car business. The cross-examination that then follows is challenged as prejudicial error:

What did Mr. Kerr have to do with the case, anything?

No, sir.

He didn't have anything to do with your stolen car business?

No, sir.

All right, he wasn't furnishing money to you?

No, sir.

. . . . . .

All right, sir. Now who was furnishing the money—was Mr. Kerr furnishing the money for the still that the McKenzies were operating?

I don't think the McKenzies were operating stills as far as I know of.

Where were they getting their whiskey?

I don't know.

You don't know that? You must knew they had some?

Yes, sir.

All right, sir. Now this dealer tag that you say—it was just a coincident that Mr. Kerr happened to have one of your dealer tags on his brown station wagon, is that right? You had sold him the car?

I have let different people use my dealer tags, which I didn't have a title.

And your dealer tag was 1954?

That's correct.

All right, sir, and what about Mr. Martin McKenzie? Now why did he have a dealer tag just like Mr. Kerr had on his car that was hauling this whiskey?

I let Martin McKenzie and Dean McKenzie have one of my dealer tags each.

Why?

Because they were friends of mine.

Of the questions asked it may be assumed that there was a possibility of prejudice to defendant Kerr in asking

co-defendant Howard, "He didn't have anything to do with your stolen car business?" and " . . . was Mr. Kerr furnishing the money for the still that the McKenzies were operating?" Each question inquired about the possibility of other criminal activities of defendant Kerr. However, the criminal activities of Howard and Martin McKenzie were concurrent in time with the present charge that defendant Kerr aided and abetted co-defendants Howard and McKenzie in their illegal possession of unstamped whisky (to which charge each had pleaded guilty).

The Government's cross-examination just recited establishes that the altered serial numbers of stolen cars dealt with the Bob Howard used car business. To develop the charge that defendant Kerr aided and abetted defendant Howard and defendant McKenzie in their possession of illegal unstamped whisky, the above interrogation of Howard apparently sought to show that he had participated in the Bob Howard used car business. The use of identical dealer tags of the Bob Howard used car business by defendant Kerr on August 16th and 23rd with those used by defendants Bob Howard and Martin McKenzie on August 23rd afforded some basis for developing the challenged interrogation.

■ To show that as an aider and abettor the defendant Kerr had wilfully associated himself with defendant Howard and defendant McKenzie in their criminal venture of possessing unstamped whisky, it was relevant to show any association of defendant Kerr with the Bob Howard used car business and the concurrent criminal ventures of defendant Howard and defendant McKenzie.

■ Thus, there was sufficient relevance and materiality to warrant the challenged questions. Whether the possible prejudice of those questions may have affected the jury and influenced the jury's verdict will be considered after the other challenged questions are considered. However, it should be noted here that since there was the possibility

of prejudice in the questions relating to the stolen car business of Howard and McKenzie's whiskey operations, it would have been a better and fairer practice had the United States Attorney asked the trial judge for permission to ask these questions out of the hearing of the jury in a voir dire examination.

■ In another question in the Government's cross-examination, alleged to be prejudicial, Robert Howard was asked,

Let me ask you directly, is it not true Mr. Kerr has been paying your wife's light bills and grocery bills since you have been incarcerated?

He sure hasn't been paying my wife's water bill or electric bill since I've been in jail.

The evidence sought to be elicited by the challenged question would tend to show a joint association of defendant Kerr and co-defendant Robert Howard. The question was also relevant and material because the evidence it sought would reveal motivation for Robert Howard's testimony that was favorable to the defendant Kerr.

At this point in the cross-examination defense counsel objected for the first time. The Court stated, "Let's proceed" and then added the following cautionary instruction:

THE COURT: Of course, ladies and gentlemen, bear in mind a question by an attorney is not any evidence in the case. You want to base your verdict on the testimony of the witnesses, not on the basis of any questions that may be stated or any matter stated in a question.

This instruction, together with similar instructions of the court given during jury deliberations (later recited) apply to the foregoing cross-examination of government counsel, and his cross-examination of Charles Ragan, associate defense counsel.

Ragan was called to rebut answers of witness Ted Parsons concerning a conversation that defense counsel had with Parsons following the first trial (which

ended in a mistrial). He was asked about a conversation with Mr. Parsons' sister. The interrogation went as follows:

All right, and you told her when you called that you would make it worth his while if he would talk to you?

Of course, I did not say any such thing.

You deny that?

Why, of course I do.

With Ragan's answers unrebutted these questions of government counsel remain without factual foundation. It was reprehensible for Government counsel to thus impugn the integrity of opposing counsel.

■ In pressing the ground of prejudicial error by reason of Government counsel's cross-examination of Robert Howard and Charles Ragan, defendant's counsel rely on Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), and United States v. Graham, 325 F.2d 922 (6th Cir. 1963). In both *Berger, supra* and *Graham, supra,* Government counsel not only engaged in repeated and improper cross-examination, but Government counsel incorporated that improper cross-examination in final argument. In *Berger, supra,* 295 U.S. at 89, 55 S.Ct. at 633, the Court ruled:

In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence. If the case against Berger had been strong, or as some courts have said, the evidence of his guilt "overwhelming," a different conclusion might be reached [citations]. Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where the misconduct of the prosecuting attorney was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential. A new trial must be awarded. . . .

In the present case, Government counsel did not pursue the challenged cross-examination of Robert Howard in the Government's cross-examination of the defendant Kerr. Moreover, it appears from the Government's brief, uncontradicted by defendant, that the matters attempted to be elicited in cross-examination are not included in the final argument of Government counsel. Hence, unlike the circumstances in *Berger, supra,* and in *Graham, supra,* the challenged conduct of Government counsel is not "pronounced and persistent," in the present case. In addition, as the review of the evidence has demonstrated, the evidence of defendant Kerr's guilt was strong, if not overwhelming.

In *Berger, supra,* the prejudice to the defendant from the "misconduct" of Government counsel was found to be "highly probable." Here, any possibility that the jury was prejudiced against the defendant by the cross-examination of witnesses Bob Howard and Charles Ragan is dispelled by affirmative actions of the jury reflected in the record.

After the jury had begun its deliberations it requested from the trial judge that he repeat his instructions "on the matter of aiding and abetting and on the subject of entrapment." The court complied. From the jury box a juror then asked,

This aiding and abetting now, a person does not, in other words, if he knows what is going on but he is not involved in it whatsoever, he is not?

The Court responded,

The mere fact that a person knows that someone else is committing a crime does not make him a participant in that crime. Likewise, the mere fact that a person is present when a crime is being committed by someone else does not make him a participant in that crime but, on the other hand, those are matters which you may consider in the case, along with all of the other evidence, in determining whether or not that person who may have been

present or who may have had knowledge was, in fact, also a participant in the commission of the offense or if he was aiding and abetting in the commission of the offense.

The court's further explanation of aiding and abetting combined with a re-reading of his original charge on the subject gave the defendant a fair and full instruction. It may be presumed from what immediately followed that the jury understood and followed these instructions on aiding and abetting.

> The Court: Does that answer your question?

A juror answered:

> Yes, sir. One other question. Now, all the evidence we should take from the witness stand, is that correct?
>
> The Court: That is correct.

The juror's question clearly reveals that the jury was considering only the testimony of witnesses and not questions put to witnesses. This conclusion reiterated the correctness of the juror's understanding by charging,

> You should not consider any matters that were not testified to by some witness in the trial of the case, even matters that may have been stated in the form of questions by the attorneys, except to the extent that those questions were adopted by the witness or stated by the witness. Even the questions proposed by the attorneys would not constitute evidence. . . .

A later request of the jury during their subsequent deliberations permits the conclusion that their verdict of guilty rests upon the evidence. The jury asked to have the testimony of Sellers re-read. The Court asked the reporter to re-read the testimony but first gave this cautionary instruction:

> Now, bear in mind, ladies and gentlemen, in the re-reading of any particular testimony that it is your obligation in this case to decide the case on the basis of all of the testimony and [not] to allow the re-reading of some portion of the testimony to cause you to give any undue influence to that portion or to cause you to overlook other testimony.

Before they retired to further consider their verdict the jury was further reminded by the court that:

> [I]t is your obligation, of course, to decide this lawsuit on all of the evidence in the case and, therefore, be careful not to allow a re-reading of some portion of the testimony to cause you to give undue emphasis to that testimony over the other testimony but bear in mind, as I say, all of the testimony as you make your decision.

The jury received these last supplemental instructions at 3:29 p. m. At 3:42 p. m. the jury returned the guilty verdict. It is concluded that the re-reading of the testimony of Special Investigator David Sellers of the ATF Division of the United States Treasury Department convinced the jury of the guilt of the defendant Kerr. The jury, as the court had just directed, decided the case on all the evidence including the Sellers testimony.

Consideration of the defendant's ground of appeal upon the entire record persuades the Court that prejudicial error was not committed by the trial court in the conduct of the trial. Moreover, it was not error to overrule defendant's motion for mistrial made at the end of all the evidence. The verdict of guilty is strongly supported by the evidence. The judgment of conviction is affirmed.